**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

WEYERHAEUSER CORPORATION
d/b/a CEDAR RIVER PAPER
COMPANY,

        Plaintiff,

vs.

D.C. TAYLOR COMPANY,

        Defendant.

No. C02-141-LRR

**OPINION AND ORDER**

---

**TABLE OF CONTENTS**

I.  INTRODUCTION AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . 2

II.  FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    A.  Weyerhaeuser's Ability to Recover if the Court Determines D.C. Taylor
        Breached the Subcontracts . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    B.  Breach of Contract Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        1.  Existence of a Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        2.  Terms and Conditions of the Contract . . . . . . . . . . . . . . . . . . . 21
        3.  Plaintiff Performed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        4.  Defendant Breached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            a.  Failure to install vapor barrier as required by design
               plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            b.  Failure to properly adhere roofs . . . . . . . . . . . . . . . . . . . 25
        5.  Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# I. INTRODUCTION AND PROCEDURAL BACKGROUND

This case arises out of a breach of contract claim for the alleged failing to install two roofs in accordance with the relevant plans and specifications.

On September 5, 2002, Plaintiff Weyerhaeuser Corporation d/b/a Cedar River Paper Company ("Weyerhaeuser") filed a Petition at Law in the Iowa District Court in and for Linn County, alleging TAMKO Roofing Products, Inc. ("TAMKO") breached an express warranty relating to the roofs on two of its buildings.

On September 27, 2002, TAMKO removed the case to this court on the basis that this court has diversity subject matter jurisdiction. TAMKO invoked this court's jurisdiction inasmuch as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332.

On October 30, 2002, TAMKO answered Weyerhaeuser's Petition.

On August 11, 2003, TAMKO filed a motion for summary judgment, which Weyerhaeuser subsequently resisted.

On August 15, 2003, Weyerhaeuser filed an Amended Complaint, adding D.C. Taylor Company ("D.C. Taylor") as a defendant. Count I of the Amended Complaint alleges a breach of contract by D.C. Taylor. Count II of the Amended Complaint alleges a breach of warranty by TAMKO. On September 23, 2003, TAMKO answered Weyerhaeuser's Amended Complaint. On November 20, 2003, D.C. Taylor answered Weyerhaeuser's Amended Complaint.

On December 17, 2003, the court granted TAMKO's motion for summary judgment and dismissed Count II. As a result, TAMKO was terminated as a defendant in this action. Thus, D.C. Taylor is the only remaining defendant in the case.

On April 15, 2004, D.C. Taylor filed a Third-Party Complaint against BE&K Construction Co., BE&K Engineering Co., BE&K, Inc. and Cedar River Paper Company.

D.C. Taylor never served any of the third-party defendants and thus they were never added to the case.

The case proceeded to a trial to the court on March 28-31, 2005. At the close of the evidence, the court reserved ruling and allowed the parties to submit written closing arguments. On April 11, 2005, Weyerhaeuser filed its written argument. On April 27, 2005, D.C. Taylor filed its written argument. On May 9, 2005, Weyerhaeuser filed its reply. The case therefore is fully submitted and ready for decision.

## II. FINDINGS OF FACT

Weyerhaeuser is a Washington corporation with its principal place of business in the State of Washington. Weyerhaeuser is an international forest products company engaged in, among other things, the manufacture of paper and paper-related products. D.C. Taylor is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. D.C. Taylor is a commercial roofing contractor. The Cedar River Paper Company ("Cedar River") facility, which is the subject of this action, is located in Linn County, Iowa. Cedar River makes brine board paper for cardboard boxes. Cardboard boxes have two flat layers with "wavy stuff" in the middle. The outside liners are made in Cedar River's Paper Machine No. 2. Corrugated medium, the "wavy stuff" between the liners, is made in Cedar River's Paper Machine No. 1. After the separate parts are made, they are sent to a box plant which puts the pieces together into cardboard boxes.

On July 30, 1993, Cedar River entered into an Engineering Procurement and Construction Contract with BE&K Construction Company ("BE&K Construction") for the engineering, design, supply of equipment and materials, construction, commissioning and start-up assistance and performance testing of a recycled corrugated medium paper production complex, called Paper Machine No. 1. On April 6, 1994, BE&K Engineering released for construction the specifications for the roof of Paper Machine No. 1. On May

3

31, 1994, BE&K Construction entered into a Subcontract Agreement with D.C. Taylor Company for the purpose of supplying and installing the roof over Paper Machine No. 1. D.C. Taylor used roofing products and materials furnished by TAMKO. Robert Ford, superintendent for D.C. Taylor who managed crews and jobs, worked on the Paper Machine No. 1 roofing project. His role with regard to Paper Machine No. 1 included ensuring D.C. Taylor had all of its materials and it achieved its goals needed to work with other contractors on the project. Ford reviewed the foreman's manual, which included booklet-sized copies of emergency contact information, safety procedures, job set-up plan, materials list, schedule for the job, drawings of pertinent details, and a drawing of the entire roof. Ford did not review the specifications, design drawings or shop drawings issued by BE&K Engineering. The drawings approved for construction were available in BE&K Construction's trailer at the construction site if Ford needed to access them.

D.C. Taylor built the Paper Machine No. 1 roof in the following manner.[1] First, D.C. Taylor inspected the precast concrete panels to make sure all welding was done and to find any cracks. Next, concrete primer was installed over all concrete surfaces of the roof. The wood nailer was then nailed to the top of the precast concrete wall panel sections. D.C. Taylor next sealed the joints between the precast concrete roof deck panels by installing 12" wide Fiberglass felt, set in hot asphalt, over the spaces between the separate panels. Next, more pieces of 12" wide Fiberglass felt, set in hot asphalt, were used to seal the joints between the concrete beam and the precast concrete roof deck panels. After that, additional 12" wide Fiberglass felt pieces, again set in hot asphalt, were used to seal the joint between the concrete beam and the precast wall panels. The parapet walls and entire roof deck were thereafter covered in hot asphalt. Subsequently,

_____

[1] Diagrams of D.C. Taylor's building process are contained in Defendant's Exhibit DD, at 1-17.

the first ply of Fiberglass felt vapor barrier was set in the hot asphalt. After visually checking to make sure asphalt was not dripping down behind the vapor barrier into the building, D.C. Taylor mopped the top of the vapor barrier with more hot asphalt and installed a second layer of Fiberglass felt vapor barrier. Because the vapor barrier covered both the horizontal surface of the roof deck and the vertical surface of the parapet wall, the vapor barrier was required to make a ninety-degree angle where the two surfaces met. Ford testified at trial D.C. Taylor's employees did not have any difficulty in making a ninety-degree angle with any of the layers of Fiberglass felt vapor barrier. Next, D.C. Taylor mopped onto the roof deck another layer of hot asphalt and laid polyisocyanurate with a felt facer on top. The procedure was repeated with a second layer of polyisocyanurate and its corresponding felt facer. After that, more hot asphalt was applied and topped with a layer of perlite insulation. Both layers of vapor barrier sealed to the parapet wall were then cut off at the height of the perlite insulation.[2] Next, a fiber cant strip, which sits at an angle over the corner made by the roof deck and parapet wall so the roof membrane does not have to make a ninety-degree angle, was set in hot asphalt on top of the perlite. Subsequently, D.C. Taylor mopped the perlite with hot asphalt and topped it with a base sheet of roofing material. An awaplan cap sheet of roofing material was

---

[2] Steve Belflower, a registered architect with BE&K Engineering and design leader of the Paper Machine Nos. 1 and 2 roofing projects, generated the specifications for the roofs on Paper Machine Nos. 1 and 2. Belflower had never designed any paper machine roofs prior to designing Paper Machine No. 1 and he had never designed a roof for a building in Iowa. At trial, Belflower conceded he never discussed the vapor barrier with anyone at D.C. Taylor. Belflower admitted it was his job to ensure the specifications and detail drawings were consistent, and he testified he failed to do so. Rather, Belflower testified the specifications, which indicated the vapor barrier sheets were to be cut off at the height of the perlite insulation, did not accurately convey the design intent of the vapor barrier and the detail drawings.

added atop another layer of hot asphalt. D.C. Taylor then added a layer of hot asphalt on top of the cap sheet and laid modified bitumen flashing on top. The flashing covered the roof deck, angled up over the fiber cant strip and extended to the top of the wood nailer, where the flashing was nailed in place. Next, D.C. Taylor laid an EPDM membrane over the top of the wall panel and nailed the membrane to the wood nailer. Finally, D.C. Taylor installed a metal coping cap that ran along the top of the parapet wall.

D.C. Taylor completed the roof for Paper Machine No. 1 on November 20, 1994. The warranty for the roof of Paper Machine No. 1, provided by TAMKO, was in effect for 10 years from November 20, 1994, the date of completion. The TAMKO warranty recommends Cedar River conduct inspections at least twice a year, once in the fall and once in the spring, check for necessary repairs brought on by extreme roof stress during summer and winter months, and arrange for additional inspections after severe weather or other hazardous occurrences.

On November 16, 1994, Cedar River entered into a second contract with BE&K Construction for the engineering, design, supply of equipment and materials, construction, commissioning and start-up assistance and performance testing of a recycled liner board paper production complex, called Paper Machine No. 2. BE&K Construction entered into a second Subcontract Agreement with D.C. Taylor to install the roof on Paper Machine No. 2. Again, D.C. Taylor used roofing products and materials furnished by TAMKO. Ford also managed the crews and job on the Paper Machine No. 2 roofing project. Again, Ford reviewed the foreman's manual but did not review the specifications, design drawings or shop drawings issued by BE&K Engineering. The drawings approved for construction were available in BE&K Construction's trailer at the construction site if Ford needed to access them. The roofs of Paper Machine No. 1 and Paper Machine No. 2 differed in building structure but required the same assemblies to be installed. D.C. Taylor used the

same roof-building procedure as the court previously described with regard to Paper Machine No. 1. Installation of the roof of Paper Machine No. 2 continued when the temperature was below freezing at the request of the Weyco project team, a group of Weyerhaeuser's employees assigned to perform construction. D.C. Taylor took precautions to keep the materials inside until needed, including heating the asphalt pots, but, due to the cold weather, it was hard to keep the asphalt at the proper temperature.

Throughout the roofing process, David Dunn, a independent contractor hired by Weyerhaeuser, inspected the roofing installation and made weekly reports to Weyerhaeuser regarding the progress. Dunn consistently indicated the work completed on the vapor barrier, including the cutting off of the vapor barrier at the height of the insulation, was acceptable. Furthermore, Dunn observed the installation of the vapor barrier and did not complain or say anything to anyone at D.C. Taylor about cutting off the vapor barrier at the height of the insulation. Chip Whitely, a roof inspector employed by BE&K Engineering, and his supervisor, Matt Kibben, also observed the installation and cutting of the vapor barrier. Neither Whitely nor Kibben told anyone from D.C. Taylor that the vapor barrier height violated the contract or was contrary to the design drawings.

D.C. Taylor completed the roof for Paper Machine No. 2 on April 17, 1996. The warranty for the roof of Paper Machine No. 2 was in effect for 10 years from April 17, 1996, the date of completion. Like the TAMKO warranty on Paper Machine No. 1, the TAMKO warranty on Paper Machine No. 2 recommends Cedar River conduct inspections at least twice a year, once in the fall and once in the spring, check for necessary repairs brought on by extreme roof stress during summer and winter months, and arrange for additional inspections after severe weather or other hazardous occurrences.

At the time Paper Machine Nos. 1 and 2 were constructed, Cedar River was an Iowa general partnership. The general partners were Weyerhaeuser Midwest, Inc.

("Weyerhaeuser Midwest"), a wholly owned subsidiary of Weyerhaeuser, and BE&K, Inc. ("BE&K) of Birmingham, Alabama. On July 2, 2001, Weyerhaeuser purchased the BE&K partnership interest in Cedar River. On December 30, 2001, Weyerhaeuser Midwest was dissolved, terminating the partnership. Cedar River became an operating division of Weyerhaeuser and Cedar River is currently not a legal entity. Rather, Cedar River is a fictitious name for Weyerhaeuser's paper plant. Cedar River transferred the land and buildings to Weyerhaeuser by warranty deed dated December 21, 2001.[3]

Following completion of Paper Machine No. 1 and Paper Machine No. 2, Cedar River did not have any preventative maintenance effort or program until 1997. In 1997, Benchmark, a roofing and paving consulting firm, recommended Cedar River conduct preventative maintenance on the roofs but Cedar River did not establish a schedule or formal maintenance program at that time. Benchmark conducted an inspection of the roofs in 1997, found various problems with the roofs, and, at Cedar River's request, D.C. Taylor fixed them. T&K Roofing Company ("T&K"), another roofing contractor, also made repairs in 1997, 1998 and 1999.

In the spring of 1999, Cedar River held a children's Easter party. During the party, the attendees noticed the southwest corner of the roof of Paper Machine No. 2 billowed up and pieces of metal fell off the roof. Cedar River hired T&K to fix the southwest corner of Paper Machine No. 2.

In spring 2000, Cedar River regularly began having a roof inspector inspect the roofs of Paper Machine No. 1 and Paper Machine No. 2 on an annual basis. In the summer of 2000, representatives from T&K told Donald Summerhill of Weyerhaeuser they saw large areas of blisters in the middle of the roof of Paper Machine No. 2. Cedar River

---

[3] The court previously found the facts included in this paragraph in its December 13, 2003 Order Regarding [TAMKO's] Motion for Summary Judgment.

contacted TAMKO, which sent two individuals to inspect the roof of Paper Machine No. 2 on July 24, 2000. Ford accompanied the TAMKO representatives on July 24, 2000. At that time, Ford cut open an enormous blister on the roof to determine whether the blister contained a small amount of air trapped in it and it would settle down at some point. Warm, moist air rushed out of the blister for at least fifteen to twenty minutes. By letter dated August 11, 2000, TAMKO asserted air inside the building blowing through the concrete made the roof bubble up. Daniel Wilkins, D.C. Taylor's roofing expert and owner of Wilkins Engineering, LLC, testified at trial he believes the billowing indicated the adhesion between the various layers of the roof system was not present.

Gilbert Arnold of Advanced Roof Technologies ("ART") conducted an investigation of Paper Machine No. 2's roof in September 2000. He found significant ridging and blistering. He determined the ridging was caused by poor adhesion of the felt to the roof insulation. Due to the ridging, the roof did not drain properly, causing water to "pond" on the roof. Arnold performed some test cuts on the roof, which did not support TAMKO's contention air inside the building caused the blistering. He determined the bitumen layer was extremely thick and fractured because the asphalt was cold when it was applied. Arnold further determined the roof was not adhered to the insulation because too little asphalt was used. Some of Arnold's test cuts indicated there was moisture in the roof insulation. Arnold opined Paper Machine No. 2 was susceptible to wind blowup. Arnold recommended Cedar River consider conducting a roof moisture survey.

In November 2000, Thomas Lauer, an engineering specialist for FM Global (Cedar River's property insurance carrier), visited the roof of Paper Machine No. 2. Lauer observed numerous blisters on the roof and determined it was in a deteriorated condition. Because of the severe blistering, Lauer was concerned the roof might blow off. Lauer testified at trial that a lack of adhesion between the top of the vapor barrier and the bottom

layer of the polyisocyanurate is typically caused by the application of asphalt when temperatures are too cold: the asphalt sets quickly before the polyisocyanurate is applied.

In 2001, Cedar River hired ART to perform an infrared survey of the roof of Paper Machine No. 2. The infrared survey, conducted at night after a very sunny day because the wet spots absorb more heat than the dry areas, uses an infrared camera to detect moisture within the roof insulation by distinguishing between the warm and cool areas, and thus the wet and dry areas, of the roof. The survey disclosed large areas of wet insulation in the roof system. Arnold returned to the roof of Paper Machine No. 2 and discovered wet areas around the perimeter of the roof, at expansion joints and at a number of the roofing curbs. Ultimately, based on the infrared survey, Arnold determined approximately 31% of the roof insulation of Paper Machine No. 2 was wet. Arnold also discovered the vapor barrier was not adhered to the parapet wall. During his visit, Arnold ran down from the roof, saying the whole south side of the roof of Paper Machine No. 2 was billowing up and he was concerned it was going to blow off. At that time, Cedar River employees put sand bags on the south side of the roof of Paper Machine No. 2 to hold it down.

In spring 2001 after the infrared survey of the roof of Paper Machine No. 2 was conducted, Gerald Kneeland, an architect with Howard R. Green Co. ("Green") also investigated the roof at the request of Ken Raiche, of Raiche Industrial Consultants, Inc. ("Raiche").[4] Kneeland determined the top membrane was loose from the insulation layers of the roof and there was moisture at various levels of insulation. Kneeland discovered moisture had deteriorated the perlite insulation, which caused the membrane to be loose from the rest of the insulation. Kneeland testified at trial the warm, moist air from inside

_____

[4] According to Kneeland's trial testimony, Raiche was already involved with the Cedar River roof problem-solving. No other evidence was presented at trial regarding how or when Raiche became involved.

the paper mill entered the roof system through an open joint between two precast wall panels. Kneeland agreed that if the roof design did not seal the vapor barrier to the roof membrane, moisture would inevitably leak into the roofing system and destroy the perlite insulation.

After the troubles with the Paper Machine No. 2 roof, Cedar River decided it was appropriate to check the condition of the roof of Paper Machine No. 1. On May 14, 2001, Advanced Roof Technologies conducted an infrared survey of Paper Machine No. 1 in the same manner as the infrared survey was conducted on Paper Machine No. 2. The results of the infrared survey showed very large areas, approximately 20-25% of the entire roof area, of wetness in the insulation. Arnold took test cuts of Paper Machine No. 1 at the same time the infrared survey was conducted. The test cuts showed the vapor barrier did not extend very far up the wall and was not well adhered to the parapet wall.[5] Arnold also determined there were places on which no asphalt was installed below the roof insulation.

On May 14 and 15, 2001, Cedar River had a meeting with Lauer, Arnold and Kneeland regarding the roofs of Paper Machine Nos. 1 and 2. The parties present at the meeting realized moisture had entered the roof systems, had separated the layers of the roofs and had disintegrated the perlite insulation. They further recognized that unless some remedial steps were taken, the moisture would continue to deteriorate the perlite insulation and separate the layers of the roofs. They discussed several options for the roofs: (1) replacing part of the roofs; (2) replacing the entirety of the roofs; or (3) using concrete blocks to hold the roofs down. The attendees agreed the roofs were not well-

---

[5] Arnold testified at trial he conducted his inspections of the ridging and blistering in order to determine whether the roof of Paper Machine No. 2 was installed pursuant to generally accepted standards. Arnold did not look at the BE&K specifications and could not say whether the installation of Paper Machine No. 2 complied with the specifications.

adhered and moisture was getting into the roof systems so the condition would worsen. Thus, they determined the most sensible and long-term cost-effective solution was to replace the entirety of the roofs on Paper Machine Nos. 1 and 2.[6]

During the tear-off process, Kneeland observed the vapor barriers on Paper Machine Nos. 1 and 2 were 50-75% not adhered to the respective parapet walls. Kneeland opined the lack of adhesion could have been caused by improper installation or by the repeated freezing and thawing of condensation in the roof pulling the vapor barrier away from the parapet wall. Kneeland also discovered the polyisocyanurate was not adhered to the vapor barrier in many places.

Green and Raiche created design specifications for the new roofs. Thereafter, Cedar River sought bids from roofing contractors. Ultimately, T&K was awarded the contract to re-roof Paper Machine Nos. 1 and 2, based on the price and capability of the contractors. The re-roofing process was conducted in three phases: during Phase 1, the south and north sections of Paper Machine No. 2 were repaired; during Phase 2, the center two sections of Paper Machine No. 2 and the lower roofs associated with the paper mill and the south section of Paper Machine No. 1 were repaired; and during Phase 3, the rest of Paper Machine No. 1 and the rest of the roofs were repaired.

T&K began re-roofing Paper Machine No. 2 in the fall of 2001.[7] The replacement

---

[6] Wilkins, who never saw the original roofs, testified at trial that, in his opinion, replacement was unnecessary and repairs to the roofs would have been sufficient.

[7] William Taylor, owner of D.C. Taylor, testified at trial he visited the roofs of Paper Machine Nos. 1 and 2 four times during the re-roofing process. The first time he visited the site was on September 19, 2001. At that time, Summerhill informed him Cedar River had hired a consultant to conduct an infrared scan of the roof of Paper Machine No. 2 and the scan indicated the insulation was wet. Summerhill further informed Taylor he

(continued…)

roof is subject to a 20-year warranty. T&K commenced replacing the roof of Paper Machine No. 1 on July 8, 2004. The replacement roof is subject to a 20-year warranty. The designs of both roofs have significant improvements over the original roof designs: (1) addition of a third layer of polyisocyanurate insulation; (2) replacement of the perlite insulation with Fiberglass insulation; (3) addition of a layer of felt as the base ply for the finished roof; (4) tapered insulation, which allows the roof to drain faster after rain; (5) vapor barrier flashing, which means the vapor barrier was extended up over the wood nailer and nailed to the far side of the wall, preventing any hot air from seeping into the roof system; (6) addition of a second layer of flashing; (7) replacement of roof membrane with a triple reinforced APP modified bitumen, which has a higher resistance to hail damage; (8) replacement of fiber cant strip with wood cant strip; (9) additional fasteners for an enhanced uplift rating; and (10) significantly improved expansion joints.

## III. CONCLUSIONS OF LAW

### A. Weyerhaeuser's Ability to Recover if the Court Determines D.C. Taylor Breached the Subcontracts

The court first addresses D.C. Taylor's allegation Weyerhaeuser is not entitled to recover in the event the court determines D.C. Taylor breached the subcontracts because Weyerhaeuser has not shown its relationship to Cedar River and Weyerhaeuser was not an intended third-party beneficiary to the subcontracts. The court previously found Cedar River transferred the paper facility land and buildings to Weyerhaeuser just before dissolving. Based on these facts, the court decided Weyerhaeuser's legal status as a subsequent owner of the Cedar River paper facility precluded Weyerhaeuser from

---

[7](…continued)

had a contract with T&K to tear off the south section of Paper Machine No. 2. Taylor approached Cedar River and offered to submit a bid for repairing the roofs. However, by that time, Cedar River had chosen to replace the roofs and rejected Taylor's offer.

recovering on its breach of warranty claim against TAMKO. Thus, Weyerhaeuser's legal status as the owner of the paper facility following Cedar River's dissolution is now the law of the case. *See Sulik v. Taney County*, 393 F.3d 765, 766 (8th Cir. 2005) (citing *Arizona v. California*, 460 U.S. 605, 518 (1983)) (holding the "law of the case" doctrine states "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). Therefore, the court already has determined the relationship between Cedar River and Weyerhaeuser. If Cedar River, as owner of the paper facility, was an intended third-party beneficiary of the subcontracts, then Weyerhaeuser acquired the status of intended third-party beneficiary when it became the owner of the paper facility. Therefore, the court will determine whether Cedar River was an intended third-party beneficiary to the subcontracts, entitling it (and its successors) to recover for a breach of the subcontracts.

The Iowa Supreme Court has adopted the *Restatement (Second) of Contracts* § 302 (1979) (hereinafter the "*Restatement*") regarding third-party beneficiary cases. *Midwest Dredging Co. v. McAninch Corp.*, 424 N.W.2d 216, 224 (Iowa 1988).[8]

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>> (b) *the circumstances indicate that the promisee intends*

---

[8] Because this court's jurisdiction is based solely on diversity of the parties, the court must apply Iowa law to the merits of the case. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (determining federal courts whose jurisdiction is based solely on diversity must apply state, rather than federal, substantive law in order to prevent parties from forum shopping).

> *to give the beneficiary the benefit of the promised performance.*
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

*Vogan v. Hayes Appraisal Assoc., Inc.*, 588 N.W.2d 420, 423 (Iowa 1999) (quotation marks omitted and emphasis in original) (citing *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 281, in turn quoting the *Restatement*; *Midwest Dredging Co.*, 424 N.W.2d at 224, in turn quoting the *Restatement*). "[T]he primary question in a third-party beneficiary case is whether the contract manifests an intent to benefit a third party." *Id.* (citing *Tredrea*, 584 N.W.2d at 281; *Midwest Dredging Co.*, 424 N.W.2d at 224). The intent does not need to be an intent to confer a direct benefit on the third party. *Id.* (citing *Tredrea*, 584 N.W.2d at 281). Instead, the Iowa Supreme Court recognized the following:

> when a contract is made, the two or more contracting parties have separate purposes; each is stimulated by various motives, some of which he may not be acutely conscious. The contract itself has no purpose, motive, or intent. The two parties may have purposes, motives and intentions; but they never have quite the same ones.
>
> In third-party cases, the right of such party does not depend upon the purpose, motive, or intent of the promisor. The motivating cause of his making the promise is usually his desire for the consideration given by the promisee. In few cases will he be moved by a desire to benefit a third person. . . .
>
> A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two other . . . if the promised performance will be of pecuniary benefit to the third party and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.

*Tredrea*, 584 N.W.2d at 281-82 (quoting 4 Corbin, *A Comprehensive Treatise on the*

*Working Rules of Contract Law* § 776, at 15-16, 18 (1951)). The Iowa Supreme Court also has determined, like "numerous other courts," that a party's intent to benefit itself and its intent to benefit a third party are not mutually exclusive. *Midwest Dredging Co.*, 424 N.W.2d at 225 (citing Note, *Third Party Beneficiaries and the Restatement (Second) of Contracts*, 67 Colum. L. Rev. 880, 893 n.75 (1982); Comment, *Contracts for the Benefit of Third Parties in the Construction Industry*, 40 Fordham L. Rev. 315 (1971)). Thus, the court is instructed to "look to the contract itself, and to the circumstances surrounding it, to determine if there was an intent" by BE&K Construction and D.C. Taylor to benefit Cedar River. *Id.*

The terms and conditions of the two subcontracts are identical. Thus, the court examines them together. Article 2 of the May 31, 1994 subcontract states, "Subcontractor recognizes Contractor's obligation to Owner for timely progress upon, and completion of, the work and each part thereof in that TIME IS OF THE ESSENCE in the performance of the work under this Agreement." Pl. Ex. 7 at 5; *see also* Pl. Ex. 8 at 5 (identical language found in the May 1, 1995 subcontract). Exhibit AA to the May 31, 1994 subcontract, admitted into evidence as Plaintiff's Exhibit 5, sets forth the terms and conditions of the subcontract.[9] The court notes the following relevant sections of Exhibit AA.

1.0    GUARANTY

1.1    Subcontractor guarantees to Contractor and Owner that the Work shall be performed free from defects in materials and workmanship (and in any designs or engineering supplied by Subcontractor), that the Work shall be in strict compliance with the plans and specifications included with the Subcontract

---

[9] Exhibit AA and the exceptions thereto, listed in the subcontracts, are identical in both subcontracts.

Documents, and shall be of the highest quality, new (unless otherwise agreed in writing), in first class condition, merchantable, of the most suitable grade, and fit for its [specified][10] purpose. In the event any Work does not meet these warranties and Contract or Owner shall give Subcontractor written notice within the guarantee period stated herein, Subcontractor shall promptly correct and/or replace any such Work at no cost to Contractor or Owner.

1.2    In the event that Subcontractor shall fail to take immediate steps to promptly correct such defects in the Work, or in the event that such defects may jeopardize the safety of persons or damage to property, then Contractor may immediately take such steps to remedy defects in Subcontractor's work, and the costs thereof shall be chargeable to Subcontractor.

1.3    Subcontractor's guarantees under Section 1.1 shall extend for a period of time equal to Contractor's guarantee or warranty obligations to Owner, but these guarantees shall in no event terminate before the earlier of 12 months from the date of operational start-up of the Work by the Owner or eighteen (18) months from the date of final written acceptance by Contractor and Owner. Work performed under these guarantees shall be guaranteed for no less than an additional 12 months from the time of correction.

Pl. Ex. 5 at 2.

Section 16.0 of Exhibit AA provides as follows:

16.0    CLAIMS

16.1    In the event of any occurrence which Subcontractor believes gives rise to any claim against Contractor and/or

---

[10] The subcontracts provide this revision to Exhibit AA. *See* Pl. Ex. 7 at 11; Pl. Ex. 8 at 15.

Owner, Subcontractor shall give prompt written notice thereof to Contractor not later than five (5) working days after such occurrence. Such notification shall give in specific detail the facts of such occurrence, the justification for any increase in Subcontract Price or modification to the schedule, and supporting documentation. Such documents shall include payroll time sheets, vendor invoices, and other documentation as Contractor may require. Subcontractor waives any and all claims against Contractor and/or Owner for any claims not filed in strict accordance with the provisions of this Section.

16.2 Upon receipt of notice from Subcontractor in accordance with the preceding Section, the parties shall negotiate in good faith to resolve any differences relative to such claim. In no event shall Subcontractor cease performance of any Work pending the resolution of any claim. Contractor shall not be bound to any changes in the Subcontract Price or schedule without its agreement and a change order issued thereunder. No claims may be asserted by Subcontractor after final payment. In any event Subcontractor shall not be entitled under this Subcontract or otherwise, and hereby waives any claims, for lost profits or consequential damages. Subcontractor's remedies are limited to those expressly provided for in this Subcontract. Limitations of liability and waivers established herein for the benefit of Owner, Contractor, their respective officers, directors and employees shall be effective regardless of negligence, strict liability or negligence [sic] of such parties.

Pl. Ex. 5 at 5. The terms and conditions of the subcontract further provide:

21.0 TITLE TO WORK

21.1 Title to all materials, equipment, goods and other things shall pass to Owner upon payment therefore or incorporation into the Work, which ever occurs first. Such title shall be free and clear from any and all liens or encumbrances of any nature. No equipment, materials, goods or other things shall

18

be removed from the project site prior to final completion and acceptance of the Work as a whole without the express written consent of Contractor.

21.2    Notwithstanding the transfer of title to Owner under the preceding Section, care, custody and control of Subcontractor's Work shall remain with Subcontractor until final completion and acceptance in writing.

Pl. Ex. 5 at 6.

After reviewing the subcontracts and the circumstances surrounding them, the court finds the subcontracts clearly were intended to benefit Cedar River in addition to BE&K Construction and D.C. Taylor. First, the subcontracts explicitly state D.C. Taylor recognizes time is of the essence in order for BE&K Construction to fulfill its obligations to Cedar River. *See* Pl. Ex. 7 at 5; Pl. Ex. 8 at 5. Second, the subcontracts guarantee to BE&K Construction and Cedar River the quality of the work and the end product. *See* Pl. Ex. 5 at 2. Third, the subcontracts also limit any liability to D.C. Taylor to which BE&K Construction or Cedar River may be subject based on an occurrence; the limitation of liability is expressly for the benefit of Cedar River (and BE&K Construction and others working on behalf of Cedar River and BE&K Construction). *See* Pl. Ex. 5 at 5. Finally, the subcontracts provide that the title to all materials, equipment, goods and other things pass to Cedar River at the time Cedar River pays for those items or upon incorporation of the items into the work. *See* Pl. Ex. 5 at 6. Clearly, then, D.C. Taylor was performing work which would benefit Cedar River by Cedar River's receipt of clear title to the items used in building the roofs and to the finished products themselves. At the time the subcontracts were entered into by BE&K Construction and D.C. Taylor, Cedar River was the owner of the paper facility. Weyerhaeuser, as Cedar River's successor, is now the

owner of the paper facility.[11]   Therefore, the court finds Weyerhaeuser is entitled to recover against D.C. Taylor as a third-party beneficiary of the subcontracts if it prevails on its breach of contract claim.

## B.  Breach of Contract Analysis

Under Iowa law, a plaintiff seeking to recover for breach of contract must prove the following elements:  "(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that [the] plaintiff has suffered damages as a result of the breach."  *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Ill. Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)).  A plaintiff must prove each element by a preponderance of the evidence in order to prevail on a breach of contract claim.  *Holliday v. Rain & Hail L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004).

### 1.  Existence of a Contract

In this case, the parties agree Cedar River entered into two Engineering Procurement and Construction Contracts with BE&K Construction for the engineering, design, supply of equipment and materials, construction, commissioning and start-up assistance and performance testing of Paper Machine Nos. 1 and 2.  The parties further agree BE&K Construction entered into two Subcontract Agreements with D.C. Taylor Company for the purpose of supplying and installing the roofs on Paper Machine Nos. 1 and 2.  Therefore, the court finds Weyerhaeuser has proven this element of its breach of contract claim.

---

[11] The subcontracts do not prevent Cedar River from assigning its rights to another party.

## 2. Terms and Conditions of the Contract

The parties dispute the terms and conditions of the subcontracts. Weyerhaeuser contends the terms of the subcontracts were contained in the documents marked Plaintiff's Exhibits 12[12] and 41. While Weyerhaeuser admits Plaintiff's Exhibit 12 is marked "Released for Bid," which the parties agree means it is not a contract document, Weyerhaeuser contends the drawings marked "Released for Contract," not offered into evidence at trial other than Plaintiff's Exhibit 13, were identical to Plaintiff's Exhibits 12 and 41. Thus, Weyerhaeuser avers the vapor barrier was supposed to extend up the parapet wall several inches above the height of the perlite insulation. D.C. Taylor asserts the terms of the subcontracts were contained in the blueprint marked "Released for Construction," Plaintiff's Exhibit 13. Therefore, D.C. Taylor contends the vapor barrier was supposed to be cut off at the height of the perlite insulation.

The court finds the terms and conditions of the subcontract regarding Paper Machine No. 1 are contained in the Subcontract Agreement dated May 31, 1994, Plaintiff's Exhibit 7; the specifications released for construction on April 6, 1994, Plaintiff's Exhibit 9; and the design drawing marked "Released for Construction," Plaintiff's Exhibit 13. The court finds the terms and conditions of the subcontract regarding Paper Machine No. 2 are contained in the Subcontract Agreement dated May 1,

---

[12] Weyerhaeuser moved to admit Plaintiff's Exhibit 12 after trial ended, contending it inadvertently failed to offer the Exhibit during trial. D.C. Taylor resists Weyerhaeuser's motion to admit the Exhibit at this stage in the proceedings. Because nearly every witness testified about Plaintiff's Exhibit 12 during trial, the court grants Weyerhaeuser's motion and admits Plaintiff's Exhibit 12. *See United States v. Dico, Inc.*, 266 F.3d 864, 873 (8th Cir. 2001) ("'A court has, of course, the general power to reopen a case, either on motion of a party or on its own motion, while the matter is still under advisement, for the receipt of further evidence.'") (citing *Arthur Murray, Inc. v. Oliver*, 364 F.2d 28, 34 (8th Cir. 1966)).

1995, Plaintiff's Exhibit 8; and the specifications released for construction on March 16, 1995, Plaintiff's Exhibit 11. No drawings relating to Paper Machine No. 2, whether marked "Released for Bid" or "Released for Construction," were offered at trial. Relevant to the issues presently before the court, both subcontracts provide that the vapor barriers shall "extend[] . . . up vertical surfaces and [be] cut off at height of insulation." Pl. Ex. 9, at 7; Pl. Ex. 11, at 10. Furthermore, the design drawing released for construction of the Paper Machine No. 1 roof shows the vapor barrier ending at the height of the perlite insulation. Pl. Ex. 13.[13]

### 3. Plaintiff Performed

Under the terms of the subcontracts regarding Paper Machine Nos. 1 and 2, BE&K Construction was required to pay D.C. Taylor for its work. The parties do not dispute BE&K Construction paid D.C. Taylor as required. However, D.C. Taylor contends Section 1.1 of Exhibit AA to both subcontracts (Plaintiff's Exhibit 5) required BE&K Construction or Cedar River to give D.C. Taylor written notice within the guarantee period that its work did not meet the warranties provided under the terms of the

---

[13] Weyerhaeuser also relies heavily on several shop drawings, at least some of which appear to be enlargements of details contained in Plaintiff's Exhibit 12, to provide terms and conditions of the subcontracts. *See* Pl. Ex. 15-20. However, the evidence presented at trial demonstrates shop drawings were not intended to be contract drawings unless the drawings were marked, "Approved" rather than merely "Received" as those Exhibits are marked. Therefore, the court finds Plaintiff's Exhibits 15-20 are not contract drawings and thus do not provide any terms and conditions of the subcontracts. Furthermore, the shop drawings add to the confusion regarding the height and placement of the vapor barrier. Plaintiff's Exhibits 17 and 19 show the vapor barrier folded over the perlite insulation away from the parapet wall. Plaintiff's Exhibit 18 shows the vapor barrier extended up to the top of the awaplan flashing. The height of the vapor barrier is not at all clear in Plaintiff's Exhibit 20. Therefore, the shop drawings marked Plaintiff's Exhibits 15-20 do not support Plaintiff's contention the subcontracts required the vapor barrier to be extended up the vertical surface several inches higher than the insulation.

subcontracts. Only then, D.C. Taylor asserts, was it required to promptly correct and/or replace any work at no cost to BE&K Construction or Cedar River. Furthermore, without giving D.C. Taylor a chance to correct and/or replace any work, D.C. Taylor asserts Weyerhaeuser cannot recover the cost of hiring T&K to fix the allegedly faulty work. D.C. Taylor contends the subcontracts state that only if (1) D.C. Taylor failed to take immediate steps to promptly correct any alleged defects or (2) the alleged defects jeopardized the safety of persons or property, then BE&K Construction immediately could take steps to remedy the alleged defects in D.C. Taylor's work, and charge the costs of such remedy to D.C. Taylor.

Weyerhaeuser maintains it orally provided D.C. Taylor with notice that its work did not meet the warranties provided under the terms of the subcontracts and it was given the opportunity to correct the alleged defects before Cedar River found another contractor to repair the roofs. Specifically, Weyerhaeuser asserts D.C. Taylor performed warranty and non-warranty repairs in 1997 and 1998 but refused to do so in 1999 because of its apparent displeasure with Cedar River's requirements. Weyerhaeuser contends it was only after D.C. Taylor refused to continue making repairs to the roofs in question that Cedar River was required to find an alternative contractor to make the repairs. Rather than going back to D.C. Taylor, which previously had refused to do further work, Weyerhaeuser alleges Cedar River then retained T&K and asked it to completely replace the roofs as required by Cedar River's consultants. Furthermore, Weyerhaeuser contends the notice requirement found in Section 1.1 of Exhibit AA to the subcontracts relates to the warranties assumed by TAMKO and, thus, Section 1.1 only requires notice to be given to TAMKO when a claim is made under the warranties; it does not require notice to be given to D.C. Taylor.

As previously noted, Section 1.1 of Exhibit AA to the subcontracts reads as follows:

> 1.1    Subcontractor guarantees to Contractor and Owner that the Work shall be performed free from defects in materials and workmanship (and in any designs or engineering supplied by Subcontractor), that the Work shall be in strict compliance with the plans and specifications included with the Subcontract Documents, and shall be of the highest quality, new (unless otherwise agreed in writing), in first class condition, merchantable, of the most suitable grade, and fit for its [specified] purpose.  In the event any Work does not meet these warranties and *Contractor or Owner shall give Subcontractor written notice* within the guarantee period stated herein, Subcontractor shall promptly correct and/or replace any such Work at no cost to Contractor or Owner.

Pl. Ex. 5 at 2 (emphasis added).  The term "Subcontractor" has the same meaning in Exhibit AA to the subcontracts as the term has in the subcontract documents themselves: D.C. Taylor.  It would be nonsensical to read the word "Subcontractor" in the last sentence of the above paragraph to mean TAMKO, particularly because the next reference to "Subcontractor" clearly means D.C. Taylor, as TAMKO would not be in a position to correct and/or replace D.C. Taylor's work.  The court finds the plain language of Section 1.1 of Exhibit AA to the subcontracts clearly requires written notice to be given to D.C. Taylor when a claim is made under the warranties created by that Section.  *See* Pl. Ex. 5 at 2.  It is undisputed BE&K Construction, the contractor; or Cedar River and/or Weyerhaeuser, the owner; never provided D.C. Taylor with written notice that the roof did not meet the warranties provided by TAMKO.  Therefore, Weyerhaeuser has failed to prove this element of its claim.

### 4. *Defendant Breached*

Weyerhaeuser contends D.C. Taylor breached the subcontracts in two ways:  (1) by failing to install the vapor barriers as required by the design plans; and (2) by failing to properly adhere the roofs.  D.C. Taylor responds it followed the design plans as

24

required and adhered the roofs properly and thus did not breach the subcontracts.

### a. *Failure to install vapor barrier as required by design plans*

Weyerhaeuser first alleges D.C. Taylor breached the subcontracts by failing to install the vapor barrier as required. D.C. Taylor alleges it followed the specifications set forth in Plaintiff's Exhibits 9 and 11 and the design plan set forth in Plaintiff's Exhibit 13. The court already has found Plaintiff's Exhibits 7, 9 and 13 comprise the terms and conditions of the subcontract regarding Paper Machine No. 1 and Plaintiff's Exhibits 8 and 11 comprise the terms and conditions of the subcontract regarding Paper Machine No. 2. The court finds D.C. Taylor installed the vapor barrier on Paper Machine No. 1 as required by Plaintiff's Exhibits 7, 9 and 13. The court further finds D.C. Taylor installed the vapor barrier on Paper Machine No. 2 as required by Plaintiff's Exhibits 8 and 11. The subcontracts required D.C. Taylor to comply with the specifications in addition to requiring D.C. Taylor to comply with the design drawings. *See* Pl. Ex. 7 at 1 (requiring D.C. Taylor to construct the roof of Paper Machine No. 1 "in accordance with the plans and specifications prepared by BE&K Engineering"); Pl. Ex. 8 at 1 (same); Pl. Ex. 9 at 5 (mandating D.C. Taylor "[p]rovide the roof system indicated on the drawings and as specified below"); Pl. Ex. 11 at 5 (same). As already stated, the specifications clearly stated the vapor barriers were to be cut off at the height of the insulation. Thus, the court finds D.C. Taylor did not breach the subcontracts by failing to install the vapor barrier as required by the design plans and specifications.

### b. *Failure to properly adhere roofs*

Weyerhaeuser next contends D.C. Taylor breached the subcontracts by failing to properly adhere the roofs. Weyerhaeuser contends the roof retained significant amounts of water and subsequently the perlite disintegrated and the roof billowed because D.C. Taylor did not apply sufficient amounts of hot asphalt to the various layers of the roof

systems. D.C. Taylor responds the roofs were originally adhered properly but due to the bad design of the roof system (cutting off the vapor barrier at the height of the insulation), the layers have come detached. Furthermore, D.C. Taylor asserts if the roof was not originally adhered properly, it was because the Weyco team insisted on apply asphalt during winter months when the temperatures were too cold for the roof materials to adhere properly. The court agrees with D.C. Taylor on both counts. First, everyone who testified agreed cutting off the vapor barrier at the height of the insulation was an ineffective manner in which to try to keep warm, humid air out of the roofing system. The only dispute between the parties was whether D.C. Taylor cut off the vapor barrier at that height in spite of directions to the contrary in the subcontracts or whether the specifications and drawings indicated D.C. Taylor should do so. The court already has found the subcontracts required D.C. Taylor to cut off the vapor barrier at the height of the insulation. Furthermore, Weyco team members insisted D.C. Taylor install the roofing materials during the winter, which in Iowa can be very cold and inhospitable for applying hot asphalt. Several of D.C. Taylor's weekly and daily progress reports regarding Paper Machine No. 2 indicate the roof was installed when the temperature was below 33° Fahrenheit. Def. Ex. K at 5; Def L at 5, 25, 49, 51, 53, 55, 63, 65, 67, 71, 73, 81, 83, 85, 87, 91. D.C. Taylor took steps to keep the materials warm until they were to be used, but were unable to keep the asphalt as hot as necessary to create proper adhesion between the roof layers. Thus, the court finds D.C. Taylor did not breach the subcontracts by failing to properly adhere the roofs. Therefore, the court finds Weyerhaeuser has failed to prove this element of its breach of contract claim.

### 5. Damages

The final element of Weyerhaeuser's breach of contract claim is the amount of damages to which it is entitled. Because the court already has determined Cedar River

and/or Weyerhaeuser did not perform as required and D.C. Taylor did not breach the contract, Weyerhaeuser is not entitled to recover any damages.

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1)     Weyerhaeuser fails on its claim for breach of contract against D.C. Taylor.

(2)     Weyerhaeuser's Motion to Admit Exhibit 12 (docket no. 86) is GRANTED.

(3)     D.C. Taylor's oral motion for a directed verdict made at the close of Weyerhaeuser's case-in-chief is DENIED.[14]

(4)     Weyerhaeuser shall bear the costs of the litigation.

(5)     The Clerk of Court shall enter judgment against Weyerhaeuser and in favor of D.C. Taylor.

**SO ORDERED.**

**DATED** this 29th day of July, 2005.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[14] At the close of Weyerhaeuser's case-in-chief, D.C. Taylor moved for a directed verdict on the basis Weyerhaeuser was not entitled to recover, even if D.C. Taylor was found to have breached the contract, because it was not an intentional third party beneficiary of the contract. At that time, the court stated it would rule on D.C. Taylor's oral motion for a directed verdict at the time it ruled on the case as a whole. Because the court already has determined Weyerhaeuser, as Cedar River's successor in interest, has rights under the subcontracts as a third-party beneficiary, D.C. Taylor's motion is denied.